UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:

Vasanthakumaran Selvarajah,

                                   Debtor.

-------------------------------------------------------------X

Manjula Selvan,

                                   Plaintiff,

                          v.

Vasanthakumaran Selvarajah,

                                Defendant.

-------------------------------------------------------------X

Chapter 7

Case No.:  1-21-40904-jmm

Adv. Pro. No.:  1-21-01057-jmm

**MEMORANDUM DECISION ON OBJECTION TO DISCHARGE AND
<u>DISCHARGEABILITY OF DEBTS</u>**

***Appearances:***

| | |
|---|---|
| Jeffrey Benjamin, Esq. | John Weinberg |
| The Linden Law Group, P.C. | Weinberg Law Firm, P.A. |
| 250 Park Avenue | 2000 Palm Beach Lakes Blvd. |
| 7th Floor | Suite 701 |
| New York, NY 10177 | West Palm Beach, FL 33409 |
| (212) 655-9536 | (561) 355-0901 |
| Email: jbenamin@nyfraudlaw.com | Email: weinberglawpa@gmail.com |
| *Counsel for Plaintiff* | *Counsel for Defendant* |

## I.    <u>INTRODUCTION</u>

Plaintiff seeks judgment that her $1.8 million claim against defendant is nondischargeable under Bankruptcy Code section 523(a)(2) because defendant induced her to lend money based on false pretenses and misrepresentations.  Plaintiff claims that after her husband died, she lent money to defendant and paid his bills because he portrayed himself as her new husband.  Plaintiff explained that in her Sri Lankan culture, a wife is obliged to obey her husband and she had no choice but to acquiesce to his demands for financial support.  Additionally, she claims that defendant falsely promised to repay the loans but, at the time the loans were made, he had no intention of repaying the debt.  For the reasons set forth below, the Court holds that $1,317,700 of the $1.8 million claim is nondischargeable.  The remainder of the claim is dischargeable because when those loans were made, the plaintiff knew or should have known that defendant could not be trusted and her reliance on defendant's promises to repay her was not justifiable.

Plaintiff also objects to defendant's discharge under Bankruptcy Code sections 727(a)(2)(A) and 727(a)(4)(A) claiming defendant failed to disclose his interests in certain companies.  Plaintiff has failed to carry her burden of proof that defendant's schedules were false or incomplete or that he concealed his property or property of the estate.  Accordingly, plaintiff's objection to defendant's discharge is denied.

## II.    <u>JURISDICTION</u>

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(b)(2), and the Standing Order of Reference entered by the United States District Court for the Eastern District of New York dated August 28, 1986, as amended by the Order dated December 5, 2012.  The Court may hear and determine the claims asserted in this proceeding because they are core proceedings under 28 U.S.C. § 157(b)(2)(I) and (J).  This decision constitutes

the Court's findings of fact and conclusions of law to the extent required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## III.    PROCEDURAL BACKGROUND

<u>The Bankruptcy Case</u>

On April 6, 2021, the debtor-defendant, Vasanthakumaran Selvarajah (the "Defendant") filed a voluntary petition for relief under chapter 7, Title 11, United States Code (the "Bankruptcy Code"). Pet., ECF No. 1.[1]

Defendant listed Manjula Selvan (the "Plaintiff") on his schedules as a creditor holding a $1.8 million unsecured claim (the "Claim"). Schedule E/F, ECF No. 1. Plaintiff described the debt as relating to a 2017 settlement agreement reached in the action *Manjula Selvan v. Vasanthakumaran Selvarajah, et. al.,* Index No. 150433/2017, Supreme Court of the State of New York, County of Richmond (the "State Court Action"). *Id.*

Defendant disclosed in his Statement of Financial Affairs that within the four years before he filed for bankruptcy he owned or had connections with the following eight businesses: Food Consulting Services LLC; Manhattan's Best Pizza Inc.; The Springs 534 Inc.; Sea Star Café at Sanibel LLC; Dantes Coal Pizza Inc.; NK3 LLC; PV Enterprises 1 LLC; and PV Enterprises 5 LLC. Statement of Fin. Affairs, ECF No. 1. Defendant represented that the entities closed between 2015 and 2017; however, Food Consulting Services, LLC was still active. *Id.*

Plaintiff also disclosed that he was party to the following lawsuits: *Performance Food Group Inc. v. Vasanthan Selvarajah, The Springs 534 Inc.*; *Itria Ventures LLC v. Beaver Street Plaza LLC, Vasanthakumaran Selvarajah, et al.*; *Miguel Nepomuceno Valencia et al. v.*

---

[1] Citations to "ECF No. []" are to documents filed in Case No. 21-42041-jmm. Citations to "Adv. ECF No. []" are to documents filed in Adv. Pro. 21-01185-jmm.

*Doughboys of 3rd Ave., Van Selvarajah et al.*; *Itria Ventures LLC, v. Manhattan's Best Pizza, Inc., The Springs 534 Inc. and Vasanthakumaran Selvarajah*; and the State Court Action. *Id.*

On September 29, 2021, the chapter 7 trustee for Defendant's bankruptcy estate filed a Report of No Distribution indicating there was no property available for distribution to creditors.

The Adversary Proceeding

On July 9, 2021, Plaintiff commenced this adversary proceeding (the "Adversary Proceeding") by filing a complaint objecting to the Defendant's discharge and to the dischargeability of the Claim. Compl., Adv. ECF No. 1.

On August 25, 2021, Plaintiff filed an amended complaint (the "Amended Complaint"), objecting to the Defendant's discharge and to the dischargeability of the Claim pursuant to Sections 523(a)(2)(A), 727(a)(3), 727(a)(4)(A), and 727(a)(4)(B). Am. Compl., Adv. ECF No. 6.

On September 10, 2021, the Defendant answered the Amended Complaint and counterclaimed that the "debt owing to Plaintiff is a consumer debt." Answer, Adv. ECF No. 7 at 2. Plaintiff answered Defendant's counterclaim, denied the allegations, and asserted a defense of failure to state a cause of action upon which relief may be granted. Reply to Countercl., Adv. ECF No. 8.

Motion to Dismiss the Adversary Proceeding

On May 24, 2022, Defendant filed a motion styled as a motion for judgment on the pleadings or summary judgment. Mot. to Dismiss, Adv. ECF No. 18. Defendant argued that Plaintiff failed to sufficiently plead a claim for relief, offered no evidence to support her claims for relief, and there were no disputed questions of material fact. *Id.* Plaintiff opposed the Motion. Pl.'s Opp'n to Mot. to Dismiss, Adv. ECF No. 19.

After hearing oral argument on June 28, 2022¸ the Court denied Defendant's request to dismiss Plaintiff's Bankruptcy Code sections 523(a)(2)(A) and 727(a)(4)(A) claims and granted Defendant's request to dismiss Plaintiff's claims under Bankruptcy Code sections 727(a)(3) and (a)(4)(B). June 28, 2022 Hr'g Tr. 25:11-19, Adv. ECF No. 21; *see* Order Granting in Part and Den. in Part, Adv. ECF No. 20.

The Second Amended Complaint

On August 19, 2022, with Defendant's consent, the Plaintiff filed a second amended complaint (the "Second Amended Complaint") purportedly to correct citations to the Bankruptcy Code. The Second Amended Complaint sought judgement denying the Debtor's discharge and declaring the Claim to be non-dischargeable pursuant to Bankruptcy Code sections 523(a)(2)(A), 727(a)(2)(A), and 727(a)(4)(A). Second Am. Compl., Adv. ECF No. 25. The Second Amended Complaint also objected to discharge pursuant to Bankruptcy Code section 727(a)(4)(B), notwithstanding the Court dismissed that claim and did not grant leave to replead. *Id*.

On September 8, 2022, Defendant answered the Second Amended Complaint. Answer to Second Am. Compl., Adv. ECF No. 28. Defendant interposed a counterclaim arguing the Claim is a consumer debt and Plaintiff's position is not substantially justified. *Id*. On September 14, 2022, Plaintiff answered the counterclaim. Reply to Second Countercl., Adv. ECF No. 29.[2]

The First Trial Date

On November 9, 2022, the Court entered an order scheduling a trial for January 24, 2023 and directing the parties to provide the Court with witness and exhibit lists by January 10, 2023.

---

[2] Defendant did not introduce evidence at trial respecting the counterclaim and did not address the counterclaim in his post-trial submissions. The Court assumes the Defendant has abandoned the counterclaim. To the extent if any, the counterclaim was not abandoned, the Court holds the counterclaim is dismissed for failure to state a claim upon which relief can be granted. Whether a claim is a consumer debt or a business debt is largely irrelevant to whether the claim is dischargeable under Bankruptcy Code section 523(a)(2).

Scheduling Order, Adv. ECF No. 30.  The trial was adjourned to January 27, 2023.  Letter of Adjournment, Adv. ECF No. 32.  On January 27, 2023, the parties appeared for trial but advised the Court they had reached a settlement.  The Court directed the parties to file a stipulation of settlement to the docket.

The Court scheduled a conference for April 20, 2023, because the parties had yet to file a stipulation of settlement.  Order to Show Cause, Adv. ECF No. 33.  The parties then notified the Court that the settlement had failed.

The Court rescheduled the trial for June 29, 2023.  On June 27, 2023, Plaintiff's new counsel requested an adjournment because he had recently been retained.  Letter Requesting Adjournment, Adv. ECF No. 42.  After hearing argument, the Court adjourned the trial to August 30, 2023.

Amended Motion to Dismiss the Adversary Proceeding

On July 18, 2023, Defendant filed an amended motion to dismiss the Adversary Proceeding and for sanctions (the "Amended Motion").  Defendant argued that Plaintiff's claims were barred by the State Court Action settlement and the Adversary Proceeding should be dismissed based on Plaintiff's delay in proceeding to trial.  Am. Mot. to Dismiss, Adv. ECF No. 48.  Defendant also requested monetary sanctions to reimburse Defendant for fees and costs resulting from Plaintiff's last-minute request for adjournment of the June 27, 2023 trial.  *Id*.  Plaintiff opposed the Amended Motion.  Pl.'s Opp'n to Am. Mot. to Dismiss, Adv. ECF No. 57.

The Court heard the Amended Motion on August 30, 2023 (the "August 30 Hearing").  The Court denied the Amended Motion to the extent Defendant requested dismissal and adjourned the hearing on Defendant's request for sanctions.

<u>The Second Trial Date</u>

During the August 30 Hearing, the Court rescheduled the trial for November 6, 2023.

On September 15, 2023, Plaintiff moved to amend her exhibit list to include transcripts of phone conversations that had been translated from Tamil into English. Pl.'s Mot. to Suppl. Trial Ex. List, Adv. ECF No. 65. Neither the audio files nor the transcripts had been produced in discovery. The Court denied the motion for the reasons set forth on the record of the October 10, 2023 hearing. Order Den. Pl.'s Mot. To Suppl. Trial Ex. List, Adv. ECF No. 71. The trial was held on November 6 and 7, 2023 and February 26, 2024. The parties were the only witnesses.

## IV.    FACTS

<u>General Background of Plaintiff and Defendant</u>

Plaintiff emigrated to the United States from Sri Lanka in April 1994 and married Roger Selvan in June 1994. Tr. Nov. 6, 2023 Hr'g 37:2-4, Adv. ECF No. 76 ("Tr. 1"). Plaintiff was 23 and Roger Selvan was 33. Tr. 1 39:7-14. The marriage was an arranged marriage. Tr. 1 39:7-9. Roger Selvan ran a successful electronics business and was wealthy. Tr. 1 37:15-38:9. Plaintiff and her husband had two children together. Tr. 1 34:11-14, 128:12-14.

Plaintiff taught English while in Sri Lanka. Tr. Nov. 7, 2023 Hr'g 27:8-12, Adv. ECF No. 72 ("Tr. 2"). After emigrating to the United States, she earned her associate's degree in computer science. Tr. 1 34:7-11, 206:15-18. However, after coming to the United States, Plaintiff did not work outside the home, did not assist her husband with his business, and did not manage the household finances. Tr. 1 37:11-19. She did not know how much money was in the family's savings account, handle the checkbook, or pay the household bills. Tr. 1 38:21-39:1. She had never opened a bank account or other financial account or gone to the post office. *Id*. Plaintiff

testified that due to her upbringing and culture, she believed it was her obligation to be subservient to her husband. Tr. 1 39:6-17.

Defendant emigrated to the United States in 1986. Tr. 2 70:5. He worked in a deli and within six years he was owner or part owner of a restaurant. Tr. 2 70:5-13. By 2009, Defendant held an ownership interest in two pizzerias. Tr. 2 16:10-14, 73:2-7. Defendant also was part owner of two restaurants located in hotels owed by Blackstone.[3] Tr. 2 14:5-16, 16:19-25, 23:8-10; Tr. 1 226:16-18. By 2015, Defendant operated restaurants in six of Blackstone's hotels. Tr. 2 16:19-25. In 2015, Blackstone sold its interests in those hotels and the restaurants closed. Tr. Hr'g Feb. 26, 2024 67:12-20, Adv. ECF No. 83 ("Tr. 3").

Defendant has been married since no later than 1994 and has two children. *See* Tr. 2 39:3-4, 39:9-11, 71:19-24. Defendant was a longtime friend of Roger Selvan. Tr. 2 71:22-72:5. Roger Selvan introduced Defendant and his wife to Plaintiff in 1994. *Id*. Plaintiff and her family regularly socialized with Defendant and his family. Tr. 1 41:16-20; Tr. 3 65:17-24.

Roger Selvan died in August 2009. Tr. 1 35:5-6. At the time of his death, Plaintiff's and Roger Selvan's children were around six and nine years of age. Tr. 1 45:3-5. In the 60 days after her husband's death, Defendant and his family visited Plaintiff often. *See* Tr. 1 45:8-11. Additionally, Defendant and his accountant, Philip Cohen, visited Plaintiff's home and Philip Cohen prepared Plaintiff's tax returns. Tr. 1 42:3-18. In October 2009, Defendant and Plaintiff commenced an intimate, physical relationship. Tr. 1 86:11-13; Tr. 2 18:25-19:5. Thereafter, Defendant introduced Plaintiff to his friend at Merrill Lynch who counseled Plaintiff to invest $500,000 of life insurance proceeds with Merrill Lynch. Tr. 1 133:10-15, 134:11-135:6. The

---

[3] Neither party provided Blackstone's full name. The Court assumes the parties are referring to an affiliate of the well-known global asset management company.

Merrill Lynch investment account was transferred to Morgan Stanley (the "Morgan Stanley Investment Account"). Tr. 1 151:1-12.

In October 2009, within sixty days after Roger Selvan's death and substantially contemporaneous with the start of the affair, Defendant started to borrow money from Plaintiff. As set forth more fully below, from 2009 to 2015, Plaintiff lent Defendant approximately $1.9 million, paid Defendant's household expenses, and made additional advances to benefit Defendant and his family. *See* Pl.'s Trial Ex. 29. From 2012 to 2015, Defendant estimates he repaid over $560,000. *See* Def.'s Trial Ex. A. In 2015, Defendant and Plaintiff ended their relationship.

Plaintiff's Loans to Defendant and Defendant's Repayments

2009 Loans

In October 2009, Plaintiff loaned Defendant $100,000. Tr. 2 72:20-73:9; Tr. 1 231:17-20. The loan enabled Defendant to buy out his partner's interests in a restaurant known as Manhattan's Best Pizza. Tr. 2 72:20-73:9; Tr. 1 231:17-20.

Plaintiff and Defendant both testified that Plaintiff lent Defendant the $100,000 after Defendant described his difficulties with his business partner to Plaintiff. Tr. 2 72:20-73:9; Tr. 1 54:5-13. Defendant testified he did not ask for the loan. Rather, Plaintiff lent him the money after asking him how to invest the $500,000 of life insurance proceeds she received when Roger Selvan died. Tr. 3 95:8-16. Later that year, Plaintiff loaned an additional $68,000 to the Defendant. Tr. 1 62:17-63:3; Tr. 3 67:22-5.

Plaintiff claims the 2009 Loans were to be repaid in two years with interest. Tr. 1 54:14-19, 194:10-17, 214:16-23, 235:5-9. Defendant denies he agreed to repay the 2009 Loans within two years. Tr. 3 19:21-20:3.

### 2010 Loans

Plaintiff loaned $887,310 to Defendant in 2010.  Tr. 1 63:5-10, Pl.'s Trial Ex. 6; *see* Pl.'s Trial Ex. 23.   Plaintiff also paid $10,500 of the Defendant's personal bills and, at Defendant's request, wired $20,000 to Defendant's sister-in-law to help her purchase a home.  Tr. 1 65:20-25, 174:23-175:2; Pl.'s Trial Ex. 24.

### 2011 Loans

Plaintiff loaned $576,101.50 to Defendant in 2011.  Tr. 1 66:24-67:3; Pl.'s Trial Ex. 6. Plaintiff also paid $4,950 of Defendant's bills.  Tr. 1 67:16-18.

### 2012 Loans and Repayments

In 2012, Plaintiff loaned the Defendant $338,000 and paid $31,800 of the Defendant's bills. Tr. 1 67:19-68:18.  Of the $338,000, $280,000 were proceeds from a portfolio loan, taken by Plaintiff against the Morgan Stanley Investment Account.  Tr. 1 151:1-5; Pl.'s Trial Exs. 12, 29.

 Plaintiff also paid $6,000 to Defendant's daughter to fund her trip to Spain.  Tr. 3 100:4-11; Pl.'s Trial Ex. 29.

Defendant claims he paid Plaintiff $118,000 in 2012.  Tr. 2: 30:24-25; Def. Trial Ex. A. Defendant provided inconsistent statements respecting $35,000 of those repayments.  On the one hand, Defendant repeatedly testified that he made no repayments prior to 2012.  *See e.g.* Tr. 3 64:13-14, 66:4-6, 73:13-14, 77:13-14, 155:19; *see also* Tr. 3 36:1-4 (summarizing repayments and starting with 2012).  Defendant's Trial Exhibit A includes the $35,000 repayments with the remaining 2012 repayments.  On the other hand, Defendant testified he paid the $35,000 to Plaintiff in 2010 but recorded the payments in 2012.  Tr. 3 66:7-10.  Defendant has not provided copies of checks or other proof of payments for amounts allegedly repaid to Plaintiff from 2010 through 2014.

Plaintiff acknowledges receipt of $145,500.00 in 2012. Pl.'s Trial Ex. 29.

### 2013 Loans and Repayments

In 2013, Plaintiff loaned the Defendant $25,000 and paid $26,500 of Defendant's bills and expenses. Pl.'s Trial Ex. 29. Defendant claims he repaid Plaintiff $118,000. Def.'s Trial Ex. A. Plaintiff acknowledges repayment of $124,700. Pl.'s Trial Ex. 29.

### 2014 Loans and Repayments

In 2014, Plaintiff loaned $55,000 to the Defendant to pay the home equity line of credit on Defendant's home. Pl.'s Trial Ex. 29; Tr. 1 70:23-71:15. Plaintiff delivered this payment to the Defendant's wife, the homeowner and obligor on the line of credit. Tr. 1 71:11-15.

Defendant claims he paid Plaintiff $171,000 in 2014. Def.'s Trial Ex. A; Tr. 2 31:9-32:13. Plaintiff claims the Defendant paid $127,300. Pl.'s Trial Ex. 29.

Defendant and Plaintiff agree that between $12,000 and $15,000 of the loans from Plaintiff were used to renovate the kitchen in Defendant's home. Tr. 1 112:10-14; Tr. 2 79:19-22; Tr. 3 109:9-13. Neither party testified as to when the kitchen was renovated.

### 2015 Repayments

Plaintiff made no loans to Defendant in 2015 and Defendant repaid $134,000. Pl. Trial Ex. 29. Defendant's Trial Exhibit A, a handwritten list of his repayments, states he paid $151,000 to Plaintiff in 2015. However, the payments listed on Defendant's Trial Exhibit A total $153,800. Defendant provided copies of checks and money orders for the 2015 repayments, albeit some of the copies are illegible.

<u>Summary of Loans and Repayments</u>

| Year | Loans to Businesses | Advances Benefitting Defendant and Family | Defendant's Calculation of Repayments | Plaintiff's Calculation of Repayments |
|---|---|---|---|---|
| 2009 | $   100,000.00 | $   68,000.00 | $        0.00 | $        0.00 |
| 2010 | 887,310.00 | 30,500.00 | 0.00 | 0.00 |
| 2011 | 576,101.50 | 4,950.00 | 0.00 | 0.00 |
| 2012 | 338,000.00 | 37,800.00 | 118,000.00 | 145,500.00 |
| 2013 | 25,000.00 | 26,500.00 | 118,000.00 | 124,700.00 |
| 2014 | 55,000.00 | 0.00 | 171,000.00 | 127,300.00 |
| 2015 | 0.00 | 0.00 | 153,800.00 | 134,000.00 |
| TOTAL | $1,981,411.50 | $167,750.00 | $560,800.00 | $531,500.00 |

<u>The Diary</u>

In 2013, the Plaintiff started a diary of her loans to, and transactions with, the Defendant. Tr. 1 106:14-25.  Plaintiff first showed Defendant the Diary in 2014.  Tr. 3 69:4-16.  In 2015, Plaintiff claims she started to fear she would not be repaid and there would be no trace of her loans because she transferred her money to a multitude of accounts used by Defendant's businesses. Accordingly, in 2015, she had the Defendant sign her diary on the pages reflecting the amounts owed.  Tr. 1 169:4-12, 69:13-18; Pl.'s Trial Ex. 23.

Defendant never kept a record of how much he borrowed from Plaintiff.  Tr. 3 69:13-14. Defendant did not know how much he owed the Plaintiff until he first saw the Diary in late 2014. Tr. 3 69:4-5, 15-18.

<u>The 2015 Promissory Note</u>

On or about January 28, 2015, Defendant signed a Promissory Note that stated:

> From the year September 2009 – December 2012, I, Manjula Selvan residing at 388 Livermore Ave Staten Island NY 10314 loaned $1,813000.00 Million to Vasanthakumaran Selvarajah residing at 397 Gower street Staten Island NY 10314. Mr. Selvarajah agreed personally guaranteed this loan is to be paid in full in five years on or before August 2020.

Pl.'s Trial Ex. 16.  Plaintiff reports she made Defendant sign the promissory note after realizing in late 2014 that Defendant was not going to repay her, and she testified that the Defendant signed the note because he feared that Plaintiff's neighbors would think he was a cheat if he did not sign. Tr. 1 272:13-22. Defendant confirmed he signed the note e out of concern that Plaintiff's neighbors and the Sri Lankan community were telling Plaintiff that the Defendant would "cheat her."  Tr. 3 69:4-12, 150:2-13.

The State Court Action

In 2017, Plaintiff commenced the State Court Action against the Defendant, his wife, and Philip Cohen, alleging conversion, conspiracy, and demanding repayment of the loans.  The State Court Action was resolved with a stipulated agreement (the "State Court Stipulation") requiring Defendant to pay $1,800,000 to the Plaintiff.  Compl., ¶ 10; Tr. 3 69:23-25.  Neither party provided the Court with a copy of the State Court Stipulation.

Defendant testified that after settling the State Court Action, he paid Plaintiff around $76,000.  Tr. 2 78:15-20.  Plaintiff's records do not reflect the payment; however, Plaintiff did not dispute receiving the payment.

Plaintiff's Evidence Concerning Her Objections to the Dischargeability of her Claims

Plaintiff argues that Defendant obtained loans from Plaintiff through false pretenses and false representations.  Pl.'s Post-Trial Br. pp. 7-10, Adv. ECF No. 87.  Plaintiff alleges she loaned money to Defendant because he promised he would take care of her and her children as if he was her husband and their father.  Am. Compl. ¶¶ 26-28.

Plaintiff says she viewed Defendant as a husband because, among other things, in October of 2009 they engaged in a private Hindu religious ceremony that signifies marriage.  Tr.1 45:15–46:13.  Plaintiff explained the ceremony occurred in the prayer room in her home and consisted of Defendant placing "Kumkum" – a red pigment – on Plaintiff's hairline.  Tr. 1 46:4-13.  Plaintiff acknowledges there were no witnesses to the ceremony.  *Id*.  Plaintiff claims Defendant's other actions made her believe he was prepared to take on the role of her husband.  In that regard, Plaintiff alleges that Defendant ingratiated himself into her family by visiting her and staying at her house during the 31-day mourning period following her husband's death, and by bringing Philip Cohen to prepare her tax returns and introducing her to his friend at Merrill Lynch.  Tr.1 41:21–43:25.  In that same vein, Plaintiff testified that Defendant encouraged her to buy life insurance to protect her children; albeit, Defendant instructed Plaintiff to name Defendant's wife as the beneficiary on the policy.  Tr. 1 268:2-15; Tr. 3 95:20-96:16.  Plaintiff complied but later changed the beneficiary to Plaintiff's sister.  Tr. 1 268:19-23.

Plaintiff also testified that Defendant participated in a coming-of-age ceremony for the Plaintiff's daughter.  *See* Tr. 1 50:10-14; Pl.'s Trial Ex. 2; Tr. 2 39:20-40:4.  Plaintiff explained the ceremony involves the child being blessed by the father, mother, or uncle.  Tr. 1 48:5-12.  Plaintiff claims the Defendant fulfilled the role of the father or uncle in the ceremony.  Plaintiff acknowledges that Defendant's wife also attended the ceremony but claims the wife attended to give a false impression that Defendant and his wife cared for the child.  Tr. 1 50:5-9, 209:4-18; Tr. 3 58:7-17.

Plaintiff testified that, due to her culture, she felt she had to obey Defendant and could not refuse his requests for money– just like she felt she had to obey Roger Selvan while he was alive.  Tr. 1 39:5-12, 51:6-11.

14

Plaintiff claims Defendant obtained loans from her by misrepresenting that his businesses were valuable, and he would repay her soon. Pl.'s Post-Trial Br. p. 7. Plaintiff testified that in 2010, Defendant told her his businesses were worth $11 million and he would repay her in two years. Tr. 1 64:7-16. Plaintiff testified that in 2012, each time she asked for payment, Plaintiff would show her company financials that appeared to show the businesses had money to "close her mouth." Tr. 1 102:19-103:6. Plaintiff also claims that Defendant threatened that if she did not continue to lend him money for the businesses, she would lose the money she already invested. Tr. 1 113:7-8. Further, Plaintiff claims when she asked Defendant for repayment, Defendant made excuses, including that payroll needed to be paid, or he needed the money for construction. Tr. 1 113:10-14. Plaintiff testified she was confused by Defendant's method of operating his businesses and suspected everything Defendant did was "crooked." Tr. 1 234:11-14. However, she decided to lend him $55,000 in 2014 based on Defendant's explanation that once he paid down his personal debt, he would be able to repay Plaintiff faster. Tr. 1 234:18-25, 237:3-10.

Plaintiff claims that Defendant never intended to repay her at all, as evidenced by the fact that he lent money to his friends that he should have used to repay her. Plaintiff testified that in 2009, Defendant paid $70,000 to his friend Sivakumar Arulapalam ("Sivakumar"). Tr. 1 143:2-9, 170:4-5; Tr. of Def.'s Dep. 112:7-19, Adv. ECF No. 19-4. In 2010 or 2011, Defendant gave his friend Premachandran $16,000 to help start a car service business. Tr. 1 140:19-141:3; Tr. 3 88:8-20. Lastly, in 2012, Defendant borrowed $100,000 from Plaintiff that Defendant lent to Suthakumaran Arulapalam ("Suthakumaran") to enable Suthakumaran to buy a house. Tr. 1 141:15-152:20. Suthakumaran repaid Defendant in 2014 but Plaintiff claims that Defendant did not tell Plaintiff or use the money to repay Plaintiff. Tr. 1 142:21-24.

Plaintiff acknowledges that Defendant made payments to her in 2012, 2013, and 2014. Tr. 1 232:2-5. She claims those payments do not evidence an intent by Defendant to repay her for three reasons. First, Plaintiff claims that Defendant continuously borrowed money from Plaintiff and used that money to make periodic payments to Plaintiff – in essence paying Plaintiff with her own money. Tr. 1 192:19-25. Second, Defendant did not start to pay her until 2012 and only because Plaintiff threatened to tell members of the local Sri Lankan community that Defendant had defrauded her. *See* Tr. 3 162:5-22; Pl.'s Post-Trial Br. p.8.

Third, the Defendant's payments were not to repay his debt to Plaintiff but to make interest payments on the 2012 loan from the Morgan Stanley Investment Account that Plaintiff took out on Defendant's behalf. In that regard, Plaintiff testified that in April 2012, Plaintiff had exhausted the money in her checking and savings accounts. Tr. 1 166 7-10. Defendant needed money for his business but could not borrow money due to his poor credit. Tr. 1 166:4-6, 136:3-6. Defendant asked Plaintiff to take a home equity loan. Tr. 1 164:4-5. Plaintiff applied for the loan but intentionally sabotaged the application process because she feared jeopardizing her home. Tr. 1 164:5-15. Plaintiff testified that Defendant then advised her to take a loan from the Morgan Stanley Investment Account. Tr. 1 136:10-24. Plaintiff testified that she agreed to take the loan after Defendant agreed to pay her $2,000 per month that she could apply toward the interest on the loan. Tr. 1 135:22–136:5. From Plaintiff's perspective, the monthly payments from Defendant were not to repay her for the amounts she loaned him but to offset the interest she was paying on the loan she had taken from Morgan Stanley at Defendant's request. Tr. 1 193:22-1945. Plaintiff testified that Defendant did not start to pay her from Defendant's own money until after Defendant signed the promissory note in January 2015. Tr. 1 197:2-4.

<u>Defendant's Evidence of Defenses to Nondischargeability Claims</u>

Defendant claims the loans were not obtained through false pretenses as Plaintiff knew Defendant was not her husband. Defendant claims that Plaintiff is a strong, educated person and Defendant did not and could not control her. Tr. 2 72:1-10.

Defendant categorically denies that any wedding ceremony occurred, and he denies he placed the Kumkum on Plaintiff. Tr. 2 75:2-15. Defendant admits to attending the coming-of-age ceremony for Plaintiff's daughter but points out that his wife was there, as well as a Hindu priest, and Plaintiff asked them to attend. *See* Tr. 1 50:10-14, 50:5-9, 209:4-18; Pl.'s Trial Ex. 2; Tr. 2 39:20-40:4; Tr. 3 58:7-17.

Defendant testified that from 2009 to 2015, Plaintiff provided Defendant with business advice concerning the restaurants he planned to open in the Blackstone hotels. Tr. 3 8:5-9:2. Defendant testified it was Plaintiff's idea that Defendant bring on fewer partners than he had with his other businesses. *Id*. Defendant testified that Plaintiff explained to him that if he brought on fewer partners, he would own a bigger percentage of the business. *Id*.

Defendant denies ever having shown Plaintiff financial information regarding his businesses or telling her his businesses were making money. Tr. 2 28:6-3. Instead, Defendant alleges that Plaintiff accessed his email account and found the financial records attached to emails from Defendant's accountant. Tr. 2 26:20-27:7. Defendant testified that Plaintiff had his email passwords because Plaintiff helped him draft emails because her English was better than his. Tr. 2 26:17-23, 27:23-28:13. Defendant also denied ever asking Plaintiff to take out a home equity loan. Tr. 3 115:20-24.

 Defendant admits he had no intention to repay the Plaintiff before 2012. Tr. 3 75:1-5. It was his understanding that he would begin repaying Plaintiff in three to five years when his

businesses became profitable, and he explained as much to the Plaintiff. Tr. 3 146:8-17. Defendant explained he did not make Plaintiff a partner in his business notwithstanding the businesses were funded by Plaintiff because Plaintiff did not ask to be a partner. Tr. 3 29:18-21.

Defendant testified that Plaintiff had asked him to put her on payroll as a way to get repaid; however, Defendant claims that Plaintiff agreed to drop the request after he warned her that putting her on payroll would risk exposing the relationship. Tr. 3 29:6-17, 30:6-8. When asked at trial how the New York Sri Lankan community could learn that Plaintiff was being paid by Defendant's Florida restaurants, Defendant testified: "If they do some paper works, they could get the payroll, yes. [The] accountant decides what kind of work they could [be] able to do. They could call the vendors." Tr. 3 30:3-7.

Defendant testified that the threat of the community learning of his relationship with Plaintiff was not the reason he started repaying Plaintiff in 2012, rather he started repaying Plaintiff because "some money started coming in" from his business. Tr. 3 81:19-82:18. Defendant also testified he delayed paying Plaintiff because he "didn't want to mix up [his] personal and [his] business" so he waited for his accountant's approval before repaying the Plaintiff. Tr. 3 94:5-8. However, Defendant testified that several payments to Plaintiff were not attributed to any of his businesses. Tr. 3 32:25-33:8.

Defendant claims he made loans to his family and friends because it is his nature to help people. Tr. 3 88:18-19. In 2010, Defendant gave $16,000 to his friend Premachandran to help him open a car service business because the Defendant wanted to help. Tr. 3 88:8-20; Def.'s Dep. 67:2-17. Defendant testified the $100,000 loan to Suthakumaran and the $70,000 loan to Sivakumar were made from the Defendant's own savings or earnings and not from Plaintiff's money. Tr. 3 86:11-87:15; Def.'s Dep. 112:7-22; *see also* Tr. 3 93:12-19 (Defendant testified he did not use the

$70,000 he loaned to Sivakumar to repay Plaintiff because she did not ask for it). Defendant claims he did not give Plaintiff the money from Suthakumaran's and Sivakumar's loan repayments because the loans were repaid in small increments of $5,000 or $6,000. Tr. 3 86:11-87:15, 94:21-95:2. The $16,000 Defendant gave to Premachandran was a gift and not repaid. Def.'s Dep. 67:5-17.

Although Defendant's testimony is ambiguous, the Defendant recalls it was in 2014 or 2015 (not 2012) that Plaintiff told Defendant that Plaintiff's neighbors had warned her that Defendant would cheat her. Tr. 3 69:7-17, 150:2-13. Once confronted with the neighbor's concerns, he signed the diary and a promissory note at the start of 2015, promising to repay $1,813,000 to Plaintiff within 5 years. Pl.'s Trial Ex. 23; Pl.'s Trial Ex. 16.

Defendant claims he could not sustain the payments because, commencing April 2015, Blackstone began selling its hotels and Defendant's restaurants in the Blackstone hotels closed. Tr. 2 67:12-17. When Defendant entered the State Court Stipulation, he believed he could recover as a businessman and pay the Plaintiff in full in a few years. Tr. 3 143:11-19. However, once the Covid-19 pandemic hit, the Defendant realized that was unrealistic and filed for bankruptcy. Tr. 2 70:19-23.

<u>Plaintiff's Evidence Concerning her Objections to the Debtor's Discharge</u>

Plaintiff claims Defendant failed to disclose his interests in certain businesses in his Schedules. Plaintiff alleged that Defendant has an interest in or is related to the following companies (the "Undisclosed Entities"):

- All About Food

- PV Enterprises 2, LLC

- PV Enterprises 3, LLC

19

- PV Enterprises 4, LLC

- Aquina Enterprises, Inc.

- Nanking NK3 LLC

- Dantes Coal Fired Pizza, LLC

- Pizza Mercato NY Inc.

- Pizza Mercato 2 LLC

- New York County Investors Inc.

Tr. 1 251:16-252:5. Plaintiff testified that she used google to investigate the Defendant, his family, associates, and businesses but had no other evidence of Defendant's involvement with the Undisclosed Entities. Tr. 1 216:18-25, 257:2-17. She does not dispute that the Undisclosed Entities are closed. Tr. 1 245:18-23. Plaintiff also claims Defendant failed to disclose his interest in Sanibel Management. Pl.'s Post-Trial Br. p. 18.

Plaintiff testified that the Defendant's daughter, Rasica Selvarajah's ("Rasica") interest in two restaurants is a front for the Defendant's interest. She believes Rasica is not a true owner of the businesses because they were shuttered in 2021 before the bankruptcy filing, and re-opened under Rasica's name. Tr. 1 258:24-259:13. The Plaintiff did not introduce evidence corroborating her testimony concerning the Defendant's interests in those entities.

Plaintiff contends Defendant has not satisfied his obligation of full disclosure because, at trial, he could not recall whether he was an officer of two other entities, namely, AAF Bar or Grill or AS Hospitality. Pl.'s Post-Trial Br. p. 17. Plaintiff did not introduce evidence that Defendant is or was an officer of either entity. *Id*.

Plaintiff claims Defendant failed to satisfy his obligation of full disclosure because, at trial, Defendant claimed he did not recall that judgments had been entered against him in favor of an

entity referred to as Itria or that Itria alleged Defendant fraudulently transferred assets to his wife and daughter.  Pl.'s Post-Trial Br. p. 17.

<u>Defendant's Evidence of Defenses to Objections to Discharge</u>

Defendant admitted he had been involved in the Undisclosed Entities, but did not to list them in his Statement of Financial Affairs because they were closed or inactive as of 2017.  Tr. 2 25:19-21, 66:3-67:21, 65:7-66:11; Df.'s Post-Trial Br. p. 13, Adv. ECF No. 90.

Defendant admitted owning Pizza Mercato 2 LLC at some point in early 2008.  *See* Tr. 2 16:10-16.  Defendant also admitted that Defendant's wife worked for Pizza Mercato from 2009 to 2014.  Tr. 3 103:7-11.  However, Defendant testified that Pizza Mercato and New York County Investors Inc. were owned solely by Suthakumaran.  Tr. 2 53:8-54:5; Tr. 3 85:10-14.

Defendant also testified that while he helped with its formation, AS Hospitality was his wife's business, and Defendant never transferred any assets to that entity.  Tr. 3 134:14-2. Defendant characterized Rasica as a successful corporate lawyer and former bartender, who owns two restaurants.  Tr. 2 21:14-16, 22:12-22.  Defendant testified he had no interest in Rasica's restaurants.  Tr. 2 22:3-18.  Defendant testified he did not have an interest in Sanibel Management, rather his company, Food Consultant Services performed consulting services for Sanibel Management.  Tr. 3 140:13-25, 141:1-8.

## V.    DISCUSSION

**<u>Burden of Proof</u>**

Plaintiffs bear the burden of proof on objections to discharge and the dischargeability of a claim.  Fed. R. Bankr. P. 4005; *see Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006); *Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar)*, 368 B.R. 120, 127 (Bankr. E.D.N.Y. 2007); *First Am. Bank of New York v. Bodenstein (In re Bodenstein)*, 168 B.R. 23, 28 (Bankr. E.D.N.Y. 1994).

Objections to discharge and dischargeability of a claim must be established by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287–88 (1991); *Ball*, 451 F.3d at 69; *Pergament v. Gonzalez (In re Gonzalez)*, 553 B.R. 467, 473 (Bankr. E.D.N.Y. 2016); *Akhtar*, 368 B.R. at 127; *Bodenstein*, 168 B.R. at 28.

"Once sufficient evidence is presented by the plaintiff to satisfy the burden of going forward with the evidence, the burden shifts to the debtor to provide evidence to rebut the plaintiff's prima facie case." *Dubrowsky v. Estate of Arnold Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 572 (E.D.N.Y. 2000) (citing *In re Gollomp*, 198 B.R. 433, 440 (S.D.N.Y. 1996)); *see Bodenstein*, 168 B.R. at 28.

**Plaintiff's Objection to the Dischargeability of Her**
**Claim under Bankruptcy Code Section 523(a)(2)(A)**

Legal Standards Applicable to § 523(a)(2)(A) Claim

Section 523(a)(2)(A) prevents dischargeability of debts "to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).

Actual fraud as used in Bankruptcy Code section 523(a)(2) includes traditional forms of fraud that can be accomplished without a false representation. *Husky Intern. Electronics, Inc. v. Ritz*, 578 U.S. 355, 359 (2016). Actual fraud denotes any fraud involving moral turpitude or intentional wrong. *Id.*

False pretenses are "implied misrepresentations intended to create and foster a false impression." *In re Scialdone*, 533 B.R. 53, 59 (Bankr. S.D.N.Y. 2015) (citing *In re Chong*, 523 B.R. 236, 243 (Bankr. D. Colo. 2014)). To establish false pretenses, a plaintiff must show "(1) an implied misrepresentation or conduct by the defendants; (2) promoted knowingly and willingly by the defendants; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiffs; (4) which wrongfully induced the plaintiffs to advance money, property, or

credit to the defendant." *In re Guo*, 548 B.R. 396, 401 (Bankr. E.D.N.Y. 2016) (internal citations omitted). False pretenses can consist of either "conscious deceptive or misleading conduct calculated to obtain, or deprive, another of property … or an implied misrepresentation or conduct intended to create a false impression." *Xin v. Zhu (In re Zhu)*, No. 19-11870-JLG, Adv. P. No. 19-01358-JLG, 2022 WL 3364579 at *18 (Bankr. S.D.N.Y. Aug. 12, 2022) (internal citations omitted).

To establish a claim is nondischargeable because it results from a false representation, a plaintiff must show "(1) defendant made a false or misleading statement; (2) with intent to deceive; (3) in order for the plaintiff to turn over money or property to the defendant." *Guo*, 548 B.R. at 401. "False representations" refer to express statements, either oral or written, which are false, misleading and designed to deceive. *Zhu*, 2022 WL 3364579 at *17. The misrepresentations must have been: (1) knowing and fraudulent falsehoods, (2) describing past or current facts, and (3) that were relied upon by the other party. *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992); *Abbott v. Hanley (In re Hanley)*, 2009 WL 2827952 at *6 (Bankr. D. Mass. Sept. 1, 2009) (collecting cases). As the misrepresentations must relate to past or current acts, a misrepresentation respecting future performance (such as a promise to repay a debt) is not actionable under Bankruptcy Code section 523(a)(2)(A), unless the debtor had no intention of performing as promised when the representation was made. *In re Allison*, 960 F.2d at 484; *Shaefer v. Demar (In re Demar)*, 373 B.R. 232, 238 (Bankr. E.D.N.Y. 2007); *In re Banayan*, 468 B.R. 542, 577 (Bankr. N.D.N.Y. 2012).

A false promise to marry can give rise to claim under 523(a)(2)(A) provided that the plaintiff proves the defendant "fraudulently induced her to thinking they would marry." *In re Balzano*, 127 B.R. 524, 530 (Bankr. E.D.N.Y. 1991); *see also Matter of Turner*, 12 B.R. 497, 501 (Bankr. N.D. Ga. 1981) ("As a matter of law, a breach of promise to marry made by a party, who

is already married at the time of the promise, may be the basis of actual fraud in the context of [section] 523(a)(2)(A) of the Bankruptcy Code.").

Fraudulent intent may be established by circumstantial evidence or by inferences drawn from a course of conduct because debtors rarely admit their intent to defraud. *Banayan*, 468 B.R. at 576. An intent to defraud may be inferred if the debtor knew or believed he would be financially unable to perform when the debt was incurred. *Alicea v. Alicea (In re Alicea)*, 230 B.R. 492, 501 (Bankr. S.D.N.Y. 1999). A debtor's failure to perform his or her obligations under an agreement also may evidence an intent to defraud. *Daly v. Braizblot (In re Braizblot)*, 194 B.R. 14, 20 (Bankr. E.D.N.Y. 1996) (defendant's failure to make any recognizable effort to fully comply with repayment schedules demonstrated a clear lack of intent to repay the plaintiffs); *In re Dongchee Choi*, 2019 WL 11031716 (Bankr. N.D.N.Y. 2019) (finding fraudulent intent where debtor repaid one loan in full, made one payment on a second loan, but transferred substantial funds to a personal account instead of applying the funds to business debts). Conversely, a debtor's payments to a creditor may evidence a debtor's lack of fraudulent intent. *Balzano*, 127 B.R. at 531; *see also In re Melnik*, 592 B.R. 9, 23 (Bankr. N.D.N.Y. 2018) (holding the inference of fraudulent intent is negated where a debtor made payments to lender and filed bankruptcy only after he could no longer do so and was unsuccessful in negotiations with lender to reduce payments). Ultimately, a Court should consider the totality of the evidence to determine whether a debtor had the intent to deceive. *Demar*, 373 B.R. at 238.

Causation must be proven under § 523(a)(2)(A) by a showing of actual and justifiable reliance on the part of the objecting creditor. *Banayan*, 468 B.R. at 577. The justifiable reliance standard is a subjective one. *See Field v. Mans*, 516 U.S. 59, 76 (1995). It is "an intermediate level of reliance; less than reasonable but more than mere reliance in fact. This means that a

creditor can[not] bury its head in the sand like an ostrich and ignore facts that are readily available to it." *In re Kedia*, 607 B.R. 101, 116 (Bankr. E.D.N.Y. 2019) (internal quotations and citations omitted).

Courts have found that reliance is justifiable when the creditor has had a good and close friendship with the debtor or an otherwise long-term relationship. *Braizblot*, 194 B.R. at 20; *see also Kuper v. Spar (In re Spar)*, 176 B.R. 321 (Bankr. S.D.N.Y. 1994) (finding justifiable reliance where the creditor often compared his relationship with the debtor to "that of a brother" and there was no doubt "the relationship was close, personal and based on trust").

<u>Application of Legal Standards to Facts</u>

The Plaintiff has failed to prove by a preponderance of the evidence that Defendant obtained the loans through false pretenses by acting as if he was Plaintiff's husband. Plaintiff testified there was a "Kumkum" ceremony but provided no corroborating evidence. Defendant denied it ever happened. Defendant's presence at Plaintiff's daughter's coming of age ceremony does not evidence a marital relationship between Plaintiff and Defendant because (a) Plaintiff testified Defendant's role in that ceremony could have been filled by an uncle, not just a father or husband; (b) Plaintiff's wife was there; and (c) Plaintiff testified that both before and after Roger Selvan died, Defendant and his family regularly socialized with Plaintiff and her family. Similarly, Defendant's presence in Plaintiff's home is not evidence that Defendant was functioning as Plaintiff's husband because Plaintiff testified that Defendant and his family were often in Plaintiff's home.

Plaintiff testified that her culture requires her to obey her husband. However, she provided no corroborating evidence that her subservience was required by her culture. Further, she provided no evidence to corroborate that she followed those cultural mores and was subservient to late

husband.  Further, her testimony that she obeyed Defendant is countered by Defendant's testimony that Plaintiff is independent, educated, and was never under his control.  Although Plaintiff's testimony was credible, her testimony, without more, is insufficient to carry her burden of proof that Defendant made her believe that he was actually or functionally her husband or that she was compelled to obey the Defendant.

The Plaintiff has failed to prove by a preponderance of the evidence that Defendant's entry into, and failure to perform under, the State Court Stipulation constitutes a false representation, false pretense, or fraud.  Neither party offered the State Court Stipulation into evidence and the Court will not assume its contents.  Defendant's explanation that he failed to make payments under the State Court Stipulation after the start of the Covid-19 Pandemic is plausible.  More importantly, Plaintiff does not dispute that Defendant made approximately $76,000 of payments on account of the State Court Stipulation.  Those payments evidence that Defendant had an intent to perform under the State Court Stipulation and Plaintiff did not introduce evidence that, after 2018, Defendant had the financial wherewithal to make additional payments but refused to do so.

Plaintiff made her prima facie case that Defendant obtained the loans through false pretense or misrepresentations.  In that regard, Plaintiff testified credibly that Defendant promised to repay the loans but had no intent to repay.  Defendant's testimony to the contrary is not credible.

Defendant testified that it was Plaintiff's idea to "invest" in Defendant's companies. Defendant contends that Plaintiff was educated and explained to him that he could make more money from the Blackstone restaurants if he took on fewer partners because he would own a larger percentage of the business.  Defendant claims Plaintiff decided to invest based, in part, on the financial records she took from his emails.  Additionally, Defendant testified he did not make Plaintiff a partner in his businesses because she never asked.  It is not credible that Defendant –

who worked his way from a deli worker to owning stakes in two pizza restaurants – was taking investment advice from someone who had not worked outside the home since 1994, had no business experience, had never managed her household finances, and needed the Defendant to find an accountant and a financial advisor.  It is not credible that Plaintiff was knowledgeable enough to ask to invest in Defendant's business but never asked to be a partner in any of the businesses.

Defendant testified he intended to repay Plaintiff once his businesses became profitable and he started repaying Plaintiff in 2012 because his businesses were bringing in more money.  However, Defendant failed to produce evidence to corroborate the changed financial condition of his businesses.  Further, Defendant testified he did not know how much he even owed Plaintiff until she showed him her diary in late 2014.

Defendant also testified he waited for his accountant's permission before repaying Plaintiff because he did not want to mix his personal and business finances.  However, Defendant borrowed money from Plaintiff for personal as well as business reasons.  Specifically, Plaintiff paid Defendant's personal bills, the home equity line of credit on his home, for renovations on Defendant's kitchen, and advanced funds to Defendant's sister-in-law and daughter.  Defendant has not explained why he needed his accountant's permission to repay Plaintiff the loans that benefitted Defendant personally and were unrelated to Defendant's businesses.

Defendant testified he denied Plaintiff's request to be put on payroll because it could expose the romantic relationship.  Defendant's trial testimony as to how the New York Sri Lankan community could obtain payroll records from Defendant's Florida businesses was unintelligible.

Defendant argues his 2010 gift of $16,000 to Premachandran, his 2012 loan of $100,000 to Suthakumaran, and his $70,000 loan to Sivakumar are not evidence that he did not intend to repay Plaintiff because the gift and loans were made from his personal funds and earnings.

Defendant has not provided bank account records or other evidence corroborating his claim that he used his personal funds for the gift or the loans. Additionally, Defendant does not dispute that in 2010, Plaintiff paid $10,500 of Defendant's expenses in addition to lending Defendant $887,310. That Defendant needed Plaintiff's assistance with his bills but had $16,000 to give away is not credible. Similarly, in 2012 -- the year Defendant lent $100,000 to Suthakumaran -- Plaintiff paid $31,800 of Defendant's bills and loaned Defendant $338,000. Notwithstanding Defendant's financial reliance on Plaintiff, Defendant contends he had the financial wherewithal to loan $100,000 to his friend. The testimony is not corroborated and is not credible.

Defendant argues his choice not to use Suthakumaran's and Sivakumar's loan repayments to repay Plaintiff is not evidence that he lacked intent to repay Plaintiff. Defendant testified he did not apply those funds to Plaintiff's claim because his friends repaid him in sporadic $5,000 or $6,000 increments. Defendant's testimony is not credible because most of Defendant's payments to Plaintiff were monthly payments ranging from $1,000 to $8,000. *See* Def.'s Trial Ex. A. Defendant's conclusion that the payments he received from his friends were too modest to pay to Plaintiff is inconsistent with his course of dealing with Plaintiff.

Defendant's payments to Plaintiff from 2012 to 2015 are some evidence that Defendant intended to repay Plaintiff, but the payments are not conclusive evidence. Using Defendant's calculations, Defendant repaid Plaintiff $118,000 in 2012. However, in that same year, Plaintiff advanced $338,000 to Defendant which supports Plaintiff's argument that Defendant was repaying her with her own money. From 2013 to 2015, Defendant repaid Plaintiff either $386,000 (Plaintiff's calculation) or $442,800 (Defendant's calculation). The repayments are significant. However, the Court is persuaded that Defendant had no intention of repaying Plaintiff when he

borrowed the money and only determined to repay the debt after Plaintiff insisted on repayment and Defendant learned his reputation in the community was at stake.

Although the Defendant obtained the loans from Plaintiff based on false pretenses, Plaintiff has failed to satisfy her burden of proof that after 2012, she justifiably relied on Defendant's promises to repay the loans.   From 2009 until 2011, Plaintiff was justified in believing that Defendant would repay her because Defendant was a longtime friend of Roger Selvan and Defendant and his family spent significant time in Plaintiff's home and had socialized regularly for decades.   After Roger Selvan's death, Defendant was often at Plaintiff's home comforting Plaintiff, he arranged for Philip Cohen to do Plaintiff's taxes, he found a financial consultant for Plaintiff, he helped Plaintiff obtain life insurance (albeit Defendant's wife was named as the beneficiary), and Defendant was physically intimate with Plaintiff.   Based on the totality of the circumstances, Plaintiff was justified in relying on Defendant's representations that he would repay her.

By 2012, Plaintiff suspected that Defendant did not intend to repay her.   In 2012, Plaintiff intentionally sabotaged her application for a home equity loan because she feared Defendant would not repay her and she would lose her house.   Yet, she testified that she agreed to take out a portfolio loan from the Morgan Stanley Investment Account to make additional loans to Defendant.   She was not justified in ignoring what she already knew – which was that Defendant could not be trusted to repay her.   From 2012 to 2014, Plaintiff lent $418,000 to Defendant and advanced $64,300 for Defendant's benefit.   Those amounts are dischargeable.

Plaintiff is owed $1,800,000 by Defendant, of that amount $482,300 is dischargeable.   The $1,317,700 remainder of the claim (less any amounts paid by Defendant after execution of the State Court Stipulation) is nondischargeable under 523(a)(2)(A).

**Plaintiff's Objection to Defendant's Discharge**
**under Bankruptcy Code Section 727**

<u>Legal Standards Applicable to Bankruptcy Code Section 727 Claims</u>

Plaintiff objects to Defendant's discharge under Bankruptcy Code sections 727(a)(2)(A) and 727(a)(4)(A).  Plaintiff also objected to Defendant's discharge based on Bankruptcy Code section 727(a)(2)(B), however, the Court dismissed that claim with prejudice.

To prevail on a claim under Bankruptcy Code section 727(a)(2)(A), a Plaintiff must prove the Defendant "with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A).  To prevail on a claim under Bankruptcy Code section 727(a)(4)(A), a plaintiff must prove "(1) the debtor made a statement under oath; (2) the statement was false; (3) the statement related materially to the bankruptcy case; (4) the debtor knew the statement was false; and (5) the debtor made the statement with fraudulent intent." *Agai v. Antoniou* (*In re Antoniou*), 515 B.R. 9, 22 (Bankr. E.D.N.Y. 2014) (citation omitted).

<u>Application of Legal Standards to Facts</u>

Plaintiff has failed to prove by a preponderance of the evidence that Defendant transferred or concealed property of the bankruptcy estate or that Defendant made a false oath or account in connection with his bankruptcy case.  Plaintiff's testimony that Defendant has an interest in the Undisclosed Entities, AAF Bar and Grill, or AS Hospitality is based solely on her google searches. She has no firsthand knowledge of the ownership of those entities, and she has not introduced other evidence that Defendant has or had an interest in those entities within the four years prior to the commencement of the bankruptcy case.  Further, Plaintiff did not introduce evidence that Defendant has or had an interest in Sanibel Management.

30

Defendant's inability to recall the particulars of judgments entered against him by Itria or the particulars of Itria's allegations is not cause to deny the Defendant a discharge because he disclosed on his Schedules that Itria commenced two lawsuits against him.

### VI.    CONCLUSION

For the reasons set forth above, Plaintiff's $1.8 million claim is nondischargeable to the extent of $1,317,700, less any amounts paid by Defendant after execution of the State Court Stipulation.  Plaintiff's objection to the Defendant's discharge is denied.

Plaintiff's counsel is directed to submit an order and judgment that conforms to this opinion within fourteen (14) days of entry.



Dated: March 31, 2025
      Brooklyn, New York

Jil Mazer-Marino
United States Bankruptcy Judge